**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 13-cv-03102-WJM

IRA MINER

        Applicant,

v.

JAMES FALK, Warden, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

        Respondents.

---

## ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS

---

Applicant, Ira Miner, has filed *pro se* an amended Application for a Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 13) challenging the validity of

his criminal conviction and sentence in Jefferson County District Court case number

06CR454.  Respondents have filed an Answer (ECF No. 41), and Applicant has filed a

Traverse (ECF No. 46).  Having considered the same, along with the state court record,

the Court will deny the Application.

## I.  BACKGROUND

On November 7, 2006, a jury convicted Mr. Miner of attempted first-degree

murder, first-degree assault, and robbery.  (ECF No. 9-1 at 7; ECF No. 9-15 at 3).  The

trial court sentenced him to a total of forty-eight years, two concurrent thirty-two year

sentences for attempted murder and first-degree assault and a consecutive sixteen

year sentence for robbery.  (ECF No. 9-1 at 5; ECF No. 9-4 at 3).

On April 15, 2010, the Colorado Court of Appeals affirmed Mr. Miner's conviction

and sentence on direct appeal in *People v. Miner,* No. 07CA0488 (Colo. App. Apr. 15, 2010) (unpublished decision).  (ECF No. 9-15).   The Colorado Supreme Court denied Mr. Miner's request for certiorari review on August 9, 2010.  (ECF No. 9-13 at 2).

On November 12, 2010, Mr. Miner filed a combined motion for sentence reconsideration pursuant to Rule 35(b) of the Colorado Rules of Criminal Procedure and reduction of mandatory sentence pursuant to Colo. Rev. Stat. § 18-1.3-406(1)(a), which the trial court denied on December 7, 2010.  (ECF No. 9-1 at 3).  Mr. Miner did not file an appeal.

On May 19, 2011, Mr. Miner filed a motion for postconviction relief pursuant to Rule 35(c) of the Colorado Rules of Criminal Procedure, which the trial court denied without a hearing on June 22, 2011.  (ECF No. 9-1 at 3).   The Colorado Court of Appeals affirmed the trial court's order in *People v. Miner,* No. 11CA1451 (Colo. App. Jan. 17, 2013) (unpublished).  (ECF No. 9-4).  The Colorado Supreme Court denied certiorari review on August 26, 2013.  (ECF No. 9-2 at 2).

 Mr. Miner initiated the instant federal habeas action on November 14, 2013.  In the Amended Application, he asserted the following three claims with numerous subclaims:

> (1) The trial court "did not have jurisdiction" over the case because
>
>> (a) Applicant was arrested at gunpoint and "in fear of physical retribution" by arresting officers, such that any statements he made during the arrest were coerced;
>>
>> (b) Arresting officers failed to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to asking for his consent to search his home;
>>
>> (c) The search of his home was without a warrant, and the consent of

2

his wife was coerced "under Color of Authority" in violation of constitutional rights and a state statute;

(d) There was insufficient evidence that he intended to kill the victim; the murder charge was based on the victim's age "and other prejudicial assumptions;" and

(e) The victim's identification of Applicant was "coerced" when police told her that defendant was her attacker.

(ECF No. 13 at 5-6).

(2) The trial court sanctioned violations of the Sixth Amendment, including:

(a) Ineffective assistance of counsel because trial counsel:

(I) Had no experience representing criminal defendants;

(ii) Made "no real attempt" to devote the time necessary to communicate adequately with him;

(iii) Failed to introduce "key elements and specific facts" that would have influenced the jury in his favor; the jury was "left ignorant" of "most of [Applicant's] information;"

(iv) Failed to conduct sufficient pretrial investigation to:

(1) seek exclusion of "any mention" of the word "homicide" from the trial;

(2) discover a videotaped confession made in the absence of counsel;

(3) request an evaluation of the victim's mental condition "to test the credibility of her statements and . . . what actually happened at the scene;" and

(4) confront the victim "about [the] alleged offense(s)," which would have established the absence of an intent to kill;

(v) Requested continuances and delays, resulting in the deprivation of his speedy trial right under 18 U.S.C. § 3161(a); and

3

(vi) Cumulative error based upon ineffective assistance of counsel, prosecutorial misconduct, and trial court error;

(b) Insufficient evidence that Applicant was "involved in anything more than a simple theft[];"

(c) Prosecutorial misconduct:

(I) In charging attempted first-degree murder solely for the purpose of "aggrandizement in a simple aggravated theft case;"

(ii) In:

(1) withholding information that juror W. had mentioned to the prosecution, after trial, something about looking at *Gray's Anatomy* during trial;

(2) subsequently having an ex parte conversation with juror W; and

(3) failing to seek a mistrial based on juror W.'s alleged misconduct;

(d) Judicial bias, in that the trial judge:

(I) Erroneously ruled that Applicant validly waived his *Miranda* rights prior to his police interview, even though Applicant did not understand that a lawyer would be appointed for him at state expense if he requested one, thereby permitting introduction of Applicant's videotaped statement made in the absence of counsel;

(ii) Questioned jurors individually, from the bench, about possible exposure to extraneous information as a result of juror W.'s disclosure, without permitting Applicant (or the prosecution) to examine or cross-examine directly and confront the jurors, and instead "censored" questions submitted by the parties;

(iii) Colluded with the prosecution to overlook juror W.'s alleged misconduct;

(iv) Erroneously prohibited the parties from contacting jurors to investigate their possible exposure to extraneous information;

4

(v) Failed to declare a mistrial upon learning that any juror might have consulted extraneous information;

(e) The jury was exposed to extraneous information, as evidenced by a comment by juror W. in a post-trial discussion with one of the prosecutors making reference to looking at *Gray's Anatomy.*

(*Id.* at 7-11).

(3) Violations of the Fourth Amendment in that:

(a) Applicant was in "physical and psychological distress" and did not consent to the search at the time it was conducted; and

(b) Officers obtained consent to search from Applicant's wife by being "deliberately deceitful" and "us[ing] pressure" on her to gain entry.

(*Id.* at 11).

On January 27, 2014, U.S. Magistrate Judge Boyd N. Boland ordered Respondents to file a second pre-answer response addressing the affirmative defenses of timeliness and exhaustion of state court remedies.  In the Pre-Answer Response to Amended § 2254 Application (ECF No. 15), Respondents conceded that the Application was timely under the one-year limitation period set forth in 28 U.S.C. § 2244(d)(1).  (*Id.* at 6).  Respondents further conceded that Mr. Miner exhausted state remedies for some subclaims but argued that Applicant did not exhaust state court remedies for many of the subclaims.  (*Id.* at 10-39).  Respondents also asserted that the unexhausted subclaims were procedurally defaulted and that some subclaims were insufficiently pleaded.  (*Id.*)

In a previous order, the Court found that Mr. Miner's subclaims and arguments were exhausted, without merit, procedurally defaulted, and insufficiently pleaded as follows:

1. Subclaims 1(a), 2(a)(iv)(4), 2(c)(ii)(2), 2(c)(ii)(3), the portion of subclaim 2(d)(I) alleging Applicant's waiver of his right to counsel during police interrogation was not knowing and intelligent, and subclaims 2(d)(ii), 2(d)(iv), 3(a) were exhausted;

2. Subclaim 2(a)(vi) was without merit and dismissed;

3. Subclaims 1(b), 1(c), 1(d), 1(e), 2(a)(iv)(1), 2(a)(iv)(2), 2(a)(iv)(3), 2(a)(v), 2(b), 2(c)(I), 2(c)(ii)(1), the portion of subclaim 2(d)(I) alleging judicial bias stemming from the trial court's determination that Applicant's waiver of his right to counsel during police interrogation was valid, subclaims 2(d)(iii), 2(d)(v), 2(e), and 3(b) and the chain-of-custody and spousal-privilege arguments were procedurally defaulted and dismissed; and

4. Subclaims 2(a)(I), 2(a)(ii), and 2(a)(iii) were insufficiently pleaded and dismissed.

(*See* ECF No. 36 at 36-37).

The Court further ordered Respondents to file an answer on the merits of the remaining exhausted subclaims.  On December 22, 2014, Respondents filed their Answer (ECF No. 41) and Mr. Miner filed his Traverse (ECF No. 46) on February 4, 2015.

The Court addresses the following remaining exhausted subclaims below: Subclaims 1(a), 2(a)(iv)(4), 2(c)(ii)(2), 2(c)(ii)(3), the portion of subclaim 2(d)(I) alleging Applicant's waiver of his right to counsel during police interrogation was not knowing and intelligent, and subclaims 2(d)(ii), 2(d)(iv), and 3(a).

6

## II.  LEGAL STANDARDS

### A.  28 U.S.C. § 2254

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be

issued with respect to any claim that was adjudicated on the merits in state court unless

the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).  The applicant bears the burden of proof under § 2254(d).  *See*

*Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

The court reviews claims of legal error and mixed questions of law and fact

pursuant to 28 U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir.

2003).  The threshold question the court must answer under § 2254(d)(1) is whether the

applicant seeks to apply a rule of law that was clearly established by the Supreme

Court at the time his conviction became final.  *See Williams v. Taylor*, 529 U.S. 362,

390 (2000).  Clearly established federal law "refers to the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court

decision." *Id*. at 412.  Furthermore,

> clearly established law consists of Supreme Court
> holdings in cases where the facts are at least closely-
> related or similar to the case *sub judice*.  Although the
> legal rule at issue need not have had its genesis in the
> closely-related or similar factual context, the Supreme
> Court must have expressly extended the legal rule to

7

that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).  If there is no clearly established

federal law, that is the end of the court's inquiry pursuant to § 2254(d)(1).  *See id*. at

1018.

If a clearly established rule of federal law is implicated, the court must determine

whether the state court's decision was contrary to or an unreasonable application of

that clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405).  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'"  *Williams*, 529 U.S. at 405 (citation omitted).
>
> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id*. at 407-08.  Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The court's inquiry pursuant to the "unreasonable application" clause is an

objective inquiry.  *See Williams*, 529 U.S. at 409–10.  "[A] federal habeas court may not

8

issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather that application must also be unreasonable." *Id*. at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671.  In addition,

> evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted).  In conducting this analysis, the court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*. at 102. Moreover, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also Richter*, 562 U.S. at 102 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2).  *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). Section 2254(d)(2) allows the federal court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court.  Pursuant to § 2254(e)(1), the court must presume that the state court's factual determinations are correct and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence.  "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'"  *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

If a claim was not adjudicated on the merits in state court, and if the claim also is not procedurally barred, the Court must review the claim *de novo* and the deferential standards of § 2254(d) do not apply.  *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

## B.  *Pro Se* Litigant

Applicant is proceeding *pro se*. The court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys."  *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007)

(citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972).  However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  A court may not assume that an applicant can prove facts that have not been alleged, or that a respondent has violated laws in ways that an applicant has not alleged.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).  *Pro se* status does not entitle an applicant to an application of different rules.  *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

## III.  ANALYSIS

### A.  Subclaims 1(a), 3(a)

Remaining for merits disposition is Applicant's allegation in subclaim 1(a) that the trial court "did not have jurisdiction" over his criminal case because he was arrested at gunpoint and "in fear of physical retribution" by arresting officers, such that any statements made during the arrest, including Applicant's consent to the search of his apartment, were coerced.  (ECF No. 13 at 5).  The Court construes subclaim 1(a) as a Fourth Amendment challenge to the voluntariness of his consent.  In subclaim 3(a), Applicant asserts a violation of the Fourth Amendment because he was in "physical and psychological distress" and did not consent to the search at the time it was conducted. (*Id.* at 11).  Thus, subclaim 3(a) is essentially a restatement of subclaim 1(a), and the Court will review the alleged Fourth Amendment violations together.

The Fourth Amendment protects against unreasonable search and seizure and

is generally enforced through the exclusionary rule.  *See, e.g., Illinois v. Gates*, 462 U.S. 213, 254 (1983); *Stone v. Powell*, 428 U.S. 465, 482-87 (1976).  In *Stone*, the Supreme Court limited federal habeas review for alleged Fourth Amendment violations based on the Court's determination that any additional contribution gained from consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the associated costs.  428 U.S. at 493-94.  The Supreme Court further held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone,* 428 U.S. at 494.

The Supreme Court has not defined precisely the phrase "opportunity for full and fair litigation."  *See Gamble v. State of Oklahoma*, 583 F.2d 1161, 1164 (10th Cir. 1978).  In *Gamble*, the Tenth Circuit determined that the phrase:

> includes, but is not limited to, the procedural opportunity to raise or otherwise present a Fourth Amendment claim.  It also includes the full and fair evidentiary hearing contemplated by *Townsend* [*v. Sain*, 372 U.S. 293 (1963)].  Furthermore, it contemplates recognition and at least colorable application of the correct Fourth Amendment constitutional standards.

*Id.* at 1165.  "Thus, a federal court is not precluded from considering Fourth Amendment claims in habeas corpus proceedings where the state court willfully refuses to apply the correct and controlling constitutional standards."  *Id.*

In the instant action, Applicant's counsel filed a motion to suppress evidence and statements obtained from the search subsequent to his arrest, and the trial court held a suppression hearing.  (*See* State Court R., 10/11/06 Hrg. Tr., at 5-6).  After hearing

testimony from police officers and Applicant, the trial court denied the motion finding

that Applicant's consent to the search was voluntary.  (*Id.* at 165-186).

On appeal, the Colorado Court of Appeals applied the following Fourth

Amendment principles:

> [a] suppression ruling involves a mixed question of law and fact; therefore, we review the district court's findings of fact for clear error and its conclusions of law de novo. *People v. Minor*, 222 P.3d 952, 955 (Colo. 2010); *People v. Shover*, 217 P.3d 901, 903 (Colo. App. 2009).

> The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution protect individuals against unreasonable searches. U.S. Const. amend. IV; Colo. Const. art. II,§ 7; *People v. Mendoza-Balderama*, 981 P.2d 150, 156 (Colo. 1999). A search without a warrant is presumptively unreasonable; however, a warrantless search is constitutionally permissible when an individual consents to the search. *People v. Castro*, 159 P.3d 597, 600 (Colo. 2007); *Mendoza-Balderama*, 981 P.2d at 156.

> To be valid, consent to a warrantless search must be freely and voluntarily given; that is, it must not be "the result of intimidation, coercion, or deception." *Turbyne v. People*, 151 P.3d 563, 572 (Colo. 2007). The consent must be "'the product of an essentially free and unconstrained choice by its maker' and not the result of circumstances where the subject's will has been overborne and her capacity for self-determination critically impaired." *People v. Reddersen*, 992 P.2d 1176, 1181 (Colo. 2000) (quoting in part *Schneckloth v. Bustamante*, 412 U.S. 218, 225 (1973)); *accord People v. Collins*, [250 P.3d 667, 672 (Colo. App. 2010)]. To assess whether a person's consent was voluntary, the court must determine first whether there is "objective evidence of coercion, duress, deception, promises, threats, intrusive conduct or other undue influence by the police, which critically impaired the defendant's judgment,' and then, bearing the defendant's particular subjective circumstances in mind, whether the police conduct could reasonably have appeared to be coercive. *Reddersen*, 992 P.2d at 1182; *accord Turbyne*, 151 P.3d at 572; *Collins*, [250 P.3d at 673].

> Determining the voluntariness of a defendant's consent to a warrantless search is a question of fact to be resolved by the district court based on the totality of the circumstances. *Castro*, 159 P.3d at 600; *People v. Scheffer*, 224 P.3d 279, 284(Colo. App. 2009). We will overturn the district court's

ruling on voluntariness only if it is clearly erroneous or not supported by the record. *Castro*, 159 P.3d at 600.

(ECF No. 9-15 at 5-7).

The state appellate court then found that the following evidence presented at the suppression hearing supported the trial court's finding that Applicant's consent to the search was voluntary:

It is undisputed that the officers who arrested defendant did not threaten defendant or make any promises to him to obtain his consent. Both defendant and Agent Hoover testified at the suppression hearing that although Agent Hoover had his gun drawn when he initially approached defendant, it was at his side, pointed toward the ground. As soon as defendant placed his hands on Agent Hoover's car, Agent Hoover holstered his gun.  Defendant was then handcuffed and placed in Agent Hoover's patrol car.

A few minutes later, Sergeant Streeter opened the car door and asked defendant if the police could search his apartment. Defendant verbally consented, and soon thereafter, one of the officers brought over a consent form.  Agent Hoover testified that he had defendant get out of the patrol car and stand next to it while he read the form to defendant, who read the form along with him. Agent Hoover explained to defendant the purpose of the search, told defendant he could refuse to consent to the search, and made no promises or threats.  Agent Hoover also testified that defendant was "very calm and cooperative."

Defendant testified that no officer threatened him, he had "no problem" with the police searching his apartment, and he knew they would do so once he signed the consent form. Though defendant also testified that he gave consent because he was "scared" and felt "guilty," absent some objective evidence of police coercion or misconduct which reasonably could have triggered defendant's subjective concerns, those perceptions did not render his consent involuntary. *See People v. Magallanes-Aragon*, 948 P.2d 528, 531 (Colo. 1997); *see also Reddersen*, 992 P.2d at 1182.

Because evidence in the record amply supports the district court's determination that defendant's consent to the search was voluntary, we cannot conclude to the contrary.

(ECF No. 9-15 at 7-9; *see also* State Court R., 10/11/06 Hrg. Tr.).

The state courts' factual findings, which are supported by the transcript of the suppression hearing, are presumed correct.  Applicant bears the burden of refuting the findings with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  In the Traverse, Applicant challenges the state courts' factual findings that the arresting officer "testified that [Applicant] was 'very calm and cooperative'" when he consented to the search. (*See* ECF No. 46 at 4).  Specifically, Applicant asserts that the police officer's testimony was contrary to Applicant's testimony that he was "scared" and consented to the search out of "fear and guilt" because the officer initially approached him "with a gun in [his] hand, no matter what direction the gun is pointed in, although there was no verbal threats made."  (*Id.* at 3-4).  The Court finds that the state courts' factual findings are supported by the state court record, and that Applicant has not pointed to anything in the suppression hearing transcript that clearly contradicts the state courts' factual findings that the police officers did not threaten Applicant and that Applicant's demeanor was "calm and cooperative."  (*See* State Court R., 10/11/06 Hrg. Tr. at 49-99, 143-151).

The Court further finds that the state court proceedings sufficed to provide Applicant with an opportunity for full and fair litigation of his claim.  *See Smallwood v. Gibson*, 191 F.3d 1257, 1265 (10th Cir.1999) (holding that petitioner was not entitled to habeas review of Fourth Amendment claim where petitioner's trial counsel informed the trial court of the factual basis for a Fourth Amendment claim, appellate counsel presented the issue to the state appellate court on direct appeal, and the state courts "thoughtfully considered the facts underlying petitioner's Fourth Amendment claim" but rejected it on the merits by applying appropriate Supreme Court precedents).  Although

15

Applicant argues in the Traverse that "[t]he trial court never cited or applied any 'case law' pertaining to the polices [sic] activities or his ruling why it was voluntarily [sic]," the Court finds that the state courts recognized and applied correct Fourth Amendment precedent, including federal and state case law applying constitutional standards, in resolving Applicant's claim.  (*See* State Court R., 10/11/06 Hrg. Tr., at 184-86, citing *Georgia v. Randolph,* 547 U.S. 103 (2006) (holding that "if a potential defendant with self-interest in objecting is in fact at the door and objects, the cotenant's permission does not suffice for a reasonable search, whereas the potential objector nearby but not invited to take pare in the threshold colloquy, loses out") and *Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990) (recognizing that a "determination of consent to enter must 'be judged against an objective standard'")); *see also* (ECF No. 9-15, at 6-9, citing federal and state case law, including *People v. Reddersen,* 992 P.2d 1176, 1181 (Colo. 2000) (quoting in part *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973) (recognizing that consent must be "the product of an essentially free and unconstrained choice by its maker and not the result of circumstances where the subject's will has been overborne and her capacity for self-determination critically impaired."))).  Thus, the Court finds that Applicant was afforded a "procedural opportunity to raise or otherwise present" his Fourth Amendment claim in the state courts, and that the courts recognized and applied correct Fourth Amendment standards in refusing to suppress the evidence seized pursuant to the search of his apartment.  *See Gamble*, 583 F.2d at 1165.

Applicant's mere disagreement with the result of his suppression hearing does not demonstrate that the state courts failed to recognize, or wilfully ignored, controlling

16

legal standards.  Thus, the Court finds that Applicant is not entitled to federal habeas relief for his Fourth Amendment claims.  Accordingly, subclaims 1(a) and 3(a) will be dismissed.

## B.  Subclaim 2(a)(iv)(4)

In subclaim 2(a)(iv)(4), Applicant contends that his trial counsel was ineffective because counsel failed to conduct sufficient pretrial investigation and did not confront the victim "about [the] alleged offense(s)," which would have established the absence of an intent to kill.  (ECF No. 13 at 7-8).

To prevail on his claim of ineffective assistance of counsel, Applicant must show that (1) counsel's legal representation fell below an objective standard of reasonableness; and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984).  Judicial scrutiny of counsel's performance is highly deferential.  *Id.* at 689 (there is a "strong presumption" that counsel's performance falls within the range of "reasonable professional assistance."). Counsel's decisions are presumed to represent "sound trial strategy;" "[f]or counsel's performance to be constitutionally ineffective, it must have been completely unreasonable, not merely wrong."  *Boyd v. Ward,* 179 F.3d 904, 914 (10th Cir. 1999) (internal quotations omitted).  In short, the "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Strickland,* 466 U.S. at 690.

Prejudice exits when there is "a reasonable probability that, but for counsel's

defective representation, the result of the proceeding would have been different." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 693.

Furthermore, under the AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Richter,* 562 U.S. at 105 (the standards created by *Strickland* and § 2254(d) are both "highly deferential" and when the two apply in tandem, review is "doubly" so). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* The Court need not address both prongs of the *Strickland* inquiry if an applicant's claim fails on one. *Strickland,* 466 U.S. at 697.

Finally, "counsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy." *DeLozier v. Sirmons,* 531 F.3d 1306, 1326 (10th Cir. 2008) (citing *Ruchie v. Mullin,* 417 F.3d 1117, 1124 (10th Cir. 2005)). This court also must presume that the decision not to examine a witness was reasonable and represented "sound trial strategy." *Church v. Sullivan,* 942 F.2d 1501, 1513 (10th Cir. 1991) ("The mere failure to cross-examine a witness does not necessarily require a finding of ineffective assistance of counsel."). Applicant bears the burden of demonstrating how more effective cross-examination might have changed the outcome of the trial. *Id.*

The Colorado Court of Appeals applied the *Strickland* standard and rejected

18

Applicant's claim on the following grounds:

"A criminal defendant is constitutionally entitled to effective assistance from his counsel." [*Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003)]. "In order to prevail on an ineffective assistance of counsel claim, a defendant must prove that 1) counsel's performance was deficient and 2) the deficient performance prejudiced the defense." *Dunlap v. People*, 173 P.3d 1054, 1062 (Colo. 2007). "The burden is on the defendant to prove each prong by a preponderance of the evidence." *People v. Duke*, 36 P.3d 149, 151 (Colo. App. 2001).

To establish deficient performance, a defendant must prove that counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 699. Reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

"[J]udicial scrutiny of counsel's performance must be highly deferential, evaluate particular acts and omissions from counsel's perspective at the time, and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Ardolino*, 69 P.3d at 76.

"Both prongs of the ineffectiveness inquiry present mixed questions of law and fact." *Dunlap*, 173 P.3d at 1063. "When reviewing a postconviction court's findings on a mixed question of law and fact, we defer to the court's findings of fact if they are supported by the record but review legal conclusions de novo." *Id*.

. . . . .

Final authority to make decisions that are strategic or tactical in nature is reserved to defense counsel. *Arko v. People,* 183 P.3d 555, 558 (Colo. 2008). "Examples of such strategic decisions include 'what witnesses to call . . ., whether and how to conduct cross-examination, what jurors to accept or strike, and what trial motions to make." *Id.* (quoting in part *People v. Curtis*, 681 P.2d 504, 511 (Colo. 1984)). Counsel has authority to make tactical decision with which the client disagrees. *Id.*

Defendant's alleged trial errors concern tactical and strategic decisions that his counsel had the discretion and authority to make, even in light of his disagreement therewith. Affording counsel's decisions a high level

of deference and a strong presumption of reasonableness, we conclude that the trial court did not err in finding that defendant's allegations, if true, would not have proved that counsel's trial decisions fell below an objective standard of reasonableness. *See Ardolino,* 69 P.3d at 76.

Even if counsel's decisions were not strategic or tactical in nature and could be considered deficient performance, defendant nevertheless fails to allege facts demonstrating prejudice. He asserts that counsel's cross examination could have "defeated, and/or at the very least lessen[ed] the effects of the prosecution['s] experts['] assertion which indicated [the victim] faced a substantial risk of death." Defendant further alleges that, if counsel had cross-examined the victim, the elicited testimony would have "been favorable to ... defendant['s] outcome at trial." However, these allegations, if true, do not rise to the standard of proving a reasonable probability that the outcome would have been different.

(ECF No. 9-4 at 9-10, 13-14).

Here, Applicant fails to demonstrate that the decision of the Colorado Court of Appeals was contrary to clearly established law. He does not cite any contradictory governing law set forth in Supreme Court cases or any materially indistinguishable Supreme Court decision that would compel a different result. *See House,* 527 F.3d at 1018.

Applicant also fails to demonstrate that the state appellate court's decision was a unreasonable application of *Strickland*. Applicant argues extensively that counsel's performance was deficient because counsel failed to cross-examine the victim. Applicant, however, makes no reasonable argument that counsel failed to satisfy *Strickland's* deferential standard that the decision not to cross-examine the victim was based on reasonable trial strategy. *See Fox v. Ward,* 200 F.3d 1286, 1296 (10th Cir. 2000) (decisions at trial only reach the level of constitutional ineffectiveness if they are "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy"); *see also Cannon v. Mullin,* 383 F.3d 1152, 1163-64 (10th

20

Cir. 2004) (holding that counsel's failure to impeach a witness with inconsistent grand jury testimony did not rise to a Sixth Amendment violation).

Furthermore, Applicant fails to demonstrate that the state court unreasonably applied the prejudice prong of the *Strickland* analysis.  Applicant's arguments regarding prejudice primarily are premised on speculation that if defense counsel had confronted the witness in cross-examination, counsel "would have asked her questions pertaining to the applicable facts of the case, and would have had a reasonable probability of a different outcome.  [The victim's] testimonies would have aided Mr. Miner demonstrated, and proven to the jury, and court that there was no intent to kill, no first degree assault, no first degree robbery, and no first degree attempt to commit murder." (ECF No. 46 at 12).  However, the state court reasonably determined that those arguments lacked merit.  (*See* ECF No. 9-4 at 14).  In short, Applicant fails to show a reasonable probability that he would have been acquitted had counsel questioned the victim.  Applicant's speculation that the outcome of his trial might have been different does not satisfy *Strickland.  See Strickland,* 466 U.S. at 693 (the likelihood of a different result must be substantial, not just conceivable.).  Thus, Applicant is not entitled to relief on subclaim 2(a)(iv)(4) because the state court's rejection was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter,* 462 U.S. at 103. Accordingly, the Court finds that the state appellate court's resolution of Applicant's claim was a reasonable application of *Strickland,* and subclaim 2(a)(iv)(4) will be dismissed.

## C.  Subclaims 2(c)(ii)(2), 2(c)(ii)(3), 2(d)(ii), and 2(d)(iv)

All of these subclaims stem from a common core of events following the verdict

and fall within the coverage of the same set of Supreme Court cases.

### 1.  Common background

The Colorado Court of Appeals summarized the events as follows:

> More than three weeks after the jury returned its verdict, the People filed a "Disclosure of Post-Verdict Contact." This disclosure informed the court that the prosecutor had spoken with two jurors after the verdict, and that one of the jurors had made a vague comment about having looked at *Gray's Anatomy* during the trial. The court scheduled a hearing on the matter for December 15, 2006.  Defendant moved for discovery related to the jurors' possible exposure to extraneous information, requesting that the prosecutor disclose the jurors' names and the full substance of his conversations with the jurors.

> At the hearing, the court granted defendant's discovery motion, but, over defendant's objection, prohibited either party from initiating communication with any of the jurors pending further court order.  In its subsequent written order, the court stated that it would conduct its "own inquiry of each juror separately [at each juror's convenience] . . . in open court, on the record," and with representatives of both parties present. The court invited the attorneys to submit written questions to ask the jurors.

> At subsequent hearings, the court questioned each juror separately, under oath, and with both parties' attorneys present. At the first hearing, before the first juror was brought in, the court considered the admissibility of the parties' proposed questions for the jurors. The court also told the attorneys that if they would like to ask follow up questions of a juror, it would hold a bench conference to discuss those questions prior to asking them.  At the end of each hearing, the court instructed each juror not to discuss the matter with any of the other jurors.

(ECF No. 9-15 at 23-25).

Following the last post-verdict hearing, the trial court concluded that the jury had

not been improperly exposed to extraneous information and denied Applicant's motion for a new trial.  (ECF No. 9-16 at 19; *see also* State Court R., 1/26/07 Hrg. Tr. at 2-21).

Based on these events, Applicant asserts that the prosecutor engaged in prosecutorial misconduct when she had an *ex parte* communication with Juror W after the verdict (subclaim 2(c)(ii)(2)); and when she failed to seek a mistrial upon Juror W's revelation regarding potential exposure to Gray's Anatomy during the trial (subclaim 2(c)(ii)(3)).  (ECF No. 13 at 9).   Applicant also alleges that the trial judge exhibited judicial bias during the post-verdict hearings, when the judge questioned jurors individually from the bench about possible exposure to extraneous information as a result of Juror W's disclosure, without permitting Applicant (or the prosecution) to examine or cross-examine directly and confront the jurors, and instead "censored" questions submitted by the parties (subclaim 2(d)(ii)); and when the judge prohibited the parties from contacting jurors to investigate their possible exposure to extraneous information (subclaim 2(d)(iii)).  (*Id.* at 9-11).  Thus, all four subclaims center on allegations of juror misconduct and how the prosecution and trial court handled the issue.

### 2.  Clearly established federal law

The clearly established federal law for purposes of improper jury contact is the Supreme Court's decision in *Remmer v. United States,* 347 U.S. 227 (1954).  In *Remmer,* a juror was approached by an anonymous person who commented that the juror could make money by voting to acquit.  347 U.S. at 228.  The juror reported the incident to the judge, who informed the prosecuting attorneys and requested that an

FBI agent investigate the incident. *Id.* The trial court and prosecutors then considered the FBI report, and concluded that the statement was made in jest. *Id.* Neither the judge nor the prosecutors informed the defense about the incident. *Id.* The Supreme Court held that

> [i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Id.* at 229. The Supreme Court further held that "[t]he presumption is not conclusive," but that the burden rests heavily upon the Government to establish, after a hearing in which "all interested parties [are] permitted to participate" that "such contact with the juror was harmless to the defendant." *Id.* at 229-30.

Based on this seminal Supreme Court case, the Tenth Circuit has held that when "a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant." *United States v. Scull,* 321 F.3d 1270, 1280 (10th Cir. 2003). This evidentiary hearing is often referred to as a "*Remmer* hearing." *See Stouffer v. Trammell,* 738 F.3d 1205, 1214 (10th Cir. 2013). Thus, the state trial court has a duty under clearly-established Supreme Court precedent "to conduct a *Remmer* hearing when genuine concerns of improper jury contact" arise. *See id.* (citing *Smith v. Phillips,* 455 U.S. 209, 215 (1982) (holding that the Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing with all interested parties")).

24

While *Remmer* established a presumption of prejudice, the "circuit courts disagree about the contours of the *Remmer* presumption of prejudice." *Stouffer,* 738 F.3d at 1214 n. 5; *see also Teniente v. Wyo. Atty. Gen.,* 412 Fed. Appx. 96, 102-06 (10th Cir. 2011) (providing an overview of the circuit split regarding the scope of the *Remmer* presumption).  On direct review, the Tenth Circuit has held that "[i]n absence of Supreme Court Authority to the contrary," the *Remmer* presumption applies. *Id.; see also Scull,* 321 F.3d at 1280 n. 5.  However, in collateral review, the Tenth Circuit has held that the *Remmer* presumption does not apply when the state court held an evidentiary hearing and the state's highest court reviewed the claim on its merits and made factual findings. *See Stouffer,* 738 F.3d at 1214 n. 5 (citing *e.g., Malicoat v. Mullin,* 426 F.3d 1241, 1250 (10th Cir. 2005) (presumption not applied in habeas cases; habeas courts can grant relief only if jury exposure to extraneous information has a "substantial and injurious effect or influence in determining the jury's verdict"); *Cannon v. Mullin,* 383 F.3d 1152, 1170 (10th Cir. 2004) ("this court has declined to apply *Remmer* in a § 2254 proceeding to determine whether jury contact was prejudicial.").

Thus, clearly established federal law requires a *Remmer* hearing as the remedy for a credible claim of improper jury exposure to extrinsic information. *See, e.g., Stouffer,* 738 F.3d at 1214 (the possibility that an extrinsic evidence may have tainted the trial triggers an obligation to conduct a hearing to determine "the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant").  Moreover, *Remmer* also mandates that "all interested parties [must be] permitted to participate."  347 U.S. at 230.  However, even under *Remmer*, trial courts have

25

"considerable discretion in determining whether any improper jury contact was prejudicial to the defendant."  *See e.g., Teniente,* 412 Fed. Appx. at 106 (recognizing that there is no clearly established law governing the conduct of a *Remmer* hearing). *See also Scull,* 321 F.3d at 1280 ("[p]ursuant to *Remmer,* we normally review for abuse of discretion the district court's decision to hold a hearing and its determination whether any jury taint requires a new trial."); *United States v. Bornfield,* 145 F.3d 1123, 1132 (10th Cir. 1998) ("The district court has 'broad discretion in determining how to handle allegations of juror bias'").  Some circuit courts also have suggested that *Remmer* "does not impose particular requirements for the conduct of hearings to examine juror bias." *See Teniente,* 412 Fed. Appx. at 106 (refusing to conclude that "these circuits' interpretation of [federa law] is unreasonable" and holding that state court's decision to "uphold the trial court's handling of the juror-contact issue was neither contrary to, nor involved an unreasonable application of, clearly established federal law.").

### 3.  Analysis of subclaims 2(d)(ii) and (iv) (alleged procedural defects in trial court's post-verdict hearings)

Applicant argues that the trial court's post-verdict hearings on possible jury exposure to extraneous information were insufficient and contrary to federal law requirements.  Specifically, he contends that the trial court did not allow the parties to fully participate in the *Remmer* hearing by not allowing the parties to personally question and cross-examine the jurors and prohibiting counsel from directly contacting the jurors to investigate the possible exposure to extraneous information.  (*See* ECF No. 46 at 17-19).  This Court cannot conclude that the state court's handling of the

26

alleged jury taint was contrary to, or involved an unreasonable application of clearly established federal law.

After summarizing the relevant factual background, the Colorado Court of Appeals concluded that the trial court's procedure during the post-verdict hearings did not deny Applicant the ability to show juror bias. Specifically, the Colorado Court of Appeals explained that:

> It is improper for a juror to use any information that "is not properly received into evidence or included in the court's instructions" in reaching a verdict. *People v. Harland,* 109 P.3d 616, 624-25 (Colo. 2005). Upon learning of a juror's possible exposure to extraneous information, the district court has broad discretion to determine what manner of hearing, if any, is warranted. *Mollaun,* 194 P.3d at 416; *see United States v. Williams-Davis,* 90 F.3d 490, 498-500 (D.C. Cir. 1996). The court may legitimately limit the scope of the inquiry to avoid juror harassment. *Wiilliams-Davis,* 90 F.3d at 500; *United States v. Wilkerson,* 656 F. Supp. 2d 11, 15, 20-21 (D.D.C. 2009); *see United States v. Calbas,* 821 F.2d 887, 896 (2d Cir. 1987) ("The court wisely refrained from allowing the inquiry to become an adversarial evidentiary hearing, so as to minimize intrusion on the jury's deliberations."); *see also People v. Tuggles,* 100 Cal. Rptr. 3d 820, 851 (Cal. Ct. App. 2009) (although criminal defendants have a right "to a jury trial free from misconduct by jurors," they do not necessarily "have a right to directly contact or subpoena jurors after trial").

> Through its inquiry, the court must determine whether the juror was actually exposed to extraneous information, and then, "based on an objective 'typical juror' standard, . . . whether use of that extraneous information posed the reasonable possibility of prejudice to the defendant." *Harlan,* 109 P.3d at 624; *see Wiser v. People,* 732 P.2d 1139, 1143 (Colo. 1987). The defendant bears the burden of proving both that misconduct occurred (i.e., that the jury was actually exposed to extraneous information) and that he was prejudiced thereby. *See Wiser,* 732 P.2d at 1141-43 ; *Moore v. People,* 125 Colo. 306, 312, 243 P.2d 425, 428-29 (1952); *People v. Baird,* 66 P.3d 183, 191 (Colo. App. 2002). We agree with other courts that have held that "where the court conducts an inquiry broad enough to lead it to a reasonable judgment that there has been no prejudice, on an assumption as to the facts favorable to [a defendant's] claim, it has fulfilled its procedural as well as its substantive duty." *Williams-Davis,* 90 F. 3d at 499; *Wilkerson,* 656 F. Supp.

2d at 15 ("The inquiry 'need not be conducted as a full evidentiary hearing'; rather it 'need only be sufficiently detailed to permit the judge to determine whether any prejudice is likely to result.'") (quoting in part *United States v. Butler,* 822 F.2d 1191, 1196 (D.C. Cir. 1987)); *see also United States v. Edelin,* 283 F. Supp. 2d 8, 14 (D.D.C. 2003) ("an examination of jurors need not rise to the level of a full adversarial hearing").

Here, defendant has failed sufficiently to articulate what relevant information he would have learned had the court permitted his counsel to contact the jurors directly, prior to their being questioned in open court. He has also failed sufficiently to explain how the court's chosen procedure for conducting its inquiry prejudiced him. Therefore, we conclude the district court did not abuse its discretion.

(ECF No. 9-15 at 25-27).

Although the trial court and the Colorado Court of Appeals did not cite *Remmer,* the state courts did not contradict or misapply clearly established federal law, which requires an evidentiary hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant. *See Scull,* 321 F.3d at 1280. Here, the trial court held an evidentiary hearing with representatives of both parties present in which the trial court adequately investigated and made specific factual findings about the challenged jury exposure to extraneous information. Specifically, the trial court held post-verdict hearings over eight days in which it questioned jurors individually regarding potential exposure to Gray's Anatomy or other external information during the trial and deliberations. (*See* ECF No. 9-15 at 24-25; *see also* State Court R., 12/28/06 Hrg. Tr., 1/2/07 Hrg. Tr., 1/3/07 Hrg. Tr., 1/5/07 Hrg. Tr., 1/8/07 Hrg. Tr., 1/9/07 Hrg. Tr., 1/17/07 Hrg. Tr., and 1/18/07 Hrg. Tr.). After considering the jurors' testimony, the trial court determined that extraneous information was not improperly before the jury during deliberations. (*See* State Court R., 1/26/07 Hrg. Tr. at

28

13).   The state appellate court also reviewed Applicant's claim on the merits and made factual findings.   Specifically, the state appellate court determined that the trial court fulfilled its procedural as well as its substantive duty in its chosen procedure for conducting its inquiry into possible jury exposure to extraneous information.   (*See* ECF No. 9-15 at 23-27).

Thus, the state courts reasonably relied on federal law because the state trial court held a *Remmer* hearing to determine the substance and extent of the possible extraneous information, whether other jurors were aware of the alleged extraneous exposure, and whether the alleged exposure influenced any juror's decision about Applicant's conviction.   Moreover, representatives from both parties were present during the hearings and had submitted written questions to ask the jurors.   (*See* ECF No. 9-15 at 24; *see also* State Court R., 12/28/06 Hrg. Tr. at 4).   Even under *Remmer*, it is reasonable to accord the trial court considerable discretion in determining whether any improper juror contact was prejudicial.   *See e.g., Scull,* 321 F.3d at 1280; *Teniente,* 412 Fed. Appx. at 106.

Applicant challenges two procedures associated with the hearing: (1) that the trial court examined the jurors itself, rather than the parties, and pre-approved questions submitted by the parties; and (2) that the trial court prohibited the parties from independently contacting the jurors.   (ECF No. 46 at 17-19).   Applicant, however, fails to cite to any clearly established federal law that requires counsel's cross-examination or direct confrontation of the jurors during the evidentiary hearing or permits counsel to personally contact jurors to conduct its own investigation.   Accordingly, Applicant has

not demonstrated that the state courts' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determine by the Supreme Court of the United States."

Applicant also fails to demonstrate that the state courts' decision "was based on an unreasonable determination of the facts in light of the evidence presented at trial." Based on a review of the state court record, Juror W testified that she told the prosecutor that his presentation would have been improved by the presence of a large diagram of the skull, such as something from Gray's Anatomy, but that she did not consult the book, did not mention the book to other jurors, and that it was not part of the jury's discussions during deliberations in reaching its verdict. (*See* State Court R., 1/2/07 Hrg. Tr. at 12-16).  She also explained that while she wanted to look at Gray's Anatomy, she did not actually look at the book prior to deliberations or prior to the verdict. (*Id.*).  Moreover, the majority of jurors did not recall any mention of the book during deliberations and all jurors testified that the verdict was not the result of any outside influence or extraneous information. (*See* State Court R., 12/28/06 Hrg. Tr. at 10-16; 1/2/07 Hrg. Tr. at 6-7, 20-24, 26-30; 1/3/07 Hrg. Tr. at 67-68; 1/5/07 Hrg. Tr. at 76-77; 1/8/07 Hrg. Tr. at 5-7; 1/9/07 Hrg. Tr. at 5-8, 11-12; 1/17/07 Hrg. Tr. at 94-96, 100-01; 1/18/07 Hrg. Tr. at 110-11; 1/26/07 Hrg. Tr. at 10-14, 21).  Based on the state courts' factual findings, which are presumed correct, this Court finds that Applicant has not rebutted that presumption by clear and convincing evidence.  Accordingly, Applicant is not entitled to habeas relief on subclaims 2(d)(ii) and 2(d)(iv).

**4.  Analysis of subclaims 2(c)(ii)(2) and (ii)(3) (alleged prosecutorial misconduct in handling potential jury exposure to extraneous information)**

30

The state courts also did not contradict or misapply clearly established federal law in resolving Applicant's claims alleging misconduct by the prosecutor in his "ex parte" communication with Juror W following her comments regarding Gray's Anatomy and in failing to seek a mistrial upon that revelation.

The clearly established federal law for purposes of a claim of prosecutorial misconduct is the Supreme Court's decision in *Darden v. Wainwright,* 477 U.S. 168 (1986). *See Parker v. Matthews,* 132 S. Ct. 2148, 2153 (2012).  In *Darden,* the Supreme Court explained that prosecutorial misconduct violates the Constitution only when the misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  477 U.S. at 181 (quoting *Donnelly v. DeChristofor,* 416 U.S. 637, 643 (1974)).  In order to determine whether prosecutorial misconduct rendered the trial fundamentally unfair, the court must consider "the totality of the circumstances, evaluating the prosecutor's conduct in the context of the whole trial." *Jackson v. Shanks,* 143 F.3d 1313, 1322 (10th Cir. 1998).  "[T]he *Darden* standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations.'" *Parker,* 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

Another controlling Supreme Court decision regarding a claim of prosecutorial misconduct in the context of alleged jury misconduct is *Smith v. Phillips,* 455 U.S. 209 (1982).  In *Smith,* a juror did not disclose that he had applied for a job as an investigator with a federal law enforcement agency during a state criminal trial.  455 U.S. at 212. When the prosecutors in the case learned of the juror's mid-trial application, they did

not disclose it to the court or defense and the defense did not learn of the juror's application until several weeks later. *Id.* at 212-13. In federal habeas review, the Supreme Court reversed the district and appellate courts' orders for a new trial. *Id.* at 214-15. The Supreme Court observed that "the aim of due process 'is not punishment of society for the misdeed of the prosecutor but avoidance of an unfair trial to the accused," and thus absent prosecutorial bad faith, inadvertent prosecution misconduct in handling an incident of potential juror misconduct is not grounds for habeas relief unless the misconduct materially prejudices the defendant. *Id.* at 219-21. Thus, the Supreme Court held that any prosecutorial misconduct did not undermine the state courts' ability to conduct a *Remmer* hearing regarding the juror's job application after trial, and thus no constitutional violation occurred. *Id.* at 220-21.

Respondents concede, and the Court agrees that the Colorado Court of Appeals did not expressly address, Applicant's subclaims regarding prosecutorial misconduct. The Court, however, owes deference to the state appellate court's result and must uphold the decision "unless [the Court's] independent review of the record and pertinent federal law persuade [the Court] that [state court's] result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Aycox v. Lytle,* 196 F.3d 1174, 1177-78 (10th Cir. 1999) (the Court "owe[s] deference to the state court's *result*, even if its reasoning is not expressly stated"). "[T]his independent review should be distinguished from a full de novo review of the petitioner's claims." *Id.*

Based on the Court's independent review of the record and the clearly

established federal law set forth above, the Court concludes that Applicant fails to demonstrate a constitutional violation based on the prosecutor's failure to seek a mistrial due to Juror W's vague comment regarding <u>Gray's Anatomy</u> and the alleged "ex parte" communication with Juror W regarding the subpoena.  The prosecutor disclosed the communications it had with Juror W and the state trial court conducted a *Remmer* hearing to determine the substance and extent of the possible extraneous information, whether other jurors were aware of the alleged extraneous exposure, and whether the alleged exposure influenced any juror's decision about Applicant's conviction.  (*See* ECF No. 9-15 at 24-25; *see also* State Court R., 12/15/06 Hrg. Tr. at 5-8; 12/28/06 Hrg. Tr. at 4; and 1/26/07 Hrg. Tr. at 2-21).  Thus, there is no evidence that any alleged prosecutorial misconduct interfered with the *Remmer* hearing.

Furthermore, Applicant's vague and unsubstantiated allegations that the prosecutor engaged in misconduct are not compelling evidence of actual prosecutorial bad faith.  (*See* ECF No. 46 at 6-7).  Therefore, Applicant is not entitled to relief because he fails to allege facts that demonstrate the alleged prosecutorial misconduct rendered his trial and subsequent *Remmer* hearing fundamentally unfair.  Thus, Applicant is not entitled to relief on subclaims 2(c)(ii)(2) and 2(c)(ii)(3).

**D.  Subclaim 2(d)(I)**

In subclaim 2(d)(I) Applicant alleges that his waiver of his right to counsel during his police interrogation was not knowing and intelligent because he did not understand he had a right to the presence of counsel during the interrogation.

The Fifth Amendment provides that "[n]o person ... shall be compelled in any

33

criminal case to be a witness against himself."  U.S. Const. Amend. V.  Under the Fifth

Amendment, statements a suspect makes during a custodial interrogation may not be

used against him in court unless the government first advises the suspect of his rights

as set forth in *Miranda v. Arizona,* 384 U.S. 436, 479 (1966).  These rights include the

right to be "clearly informed," prior to custodial questioning, that the suspect has "the

right to consult with a lawyer and to have the lawyer with him during interrogation."

*Miranda,* 384 U.S. at 471; *Florida v. Powell,* 559 U.S. 50, 60 (2010).

The Supreme Court has repeatedly declined to dictate the particular words in

which the *Miranda* warnings must be conveyed.  *See Powell,* 559 U.S. at 60; *see also*

*Duckworth v. Eagan,* 492 U.S. 195, 202 (1989) (commenting that the Court has never

required that *Miranda* warnings be given in the exact form described in that decision);

*California v. Prysock,* 453 U.S. 355, 359-60 (1981) (remarking that *Miranda* itself

indicated that no talismanic incantation was required to satisfy its strictures).  In

determining whether police officers adequately imparted the *Miranda* warnings, "[t]he

inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as

required by *Miranda.*' " *Powell,* 559 U.S. at 60 (quoting *Duckworth,* 492 U.S. at 203,

quoting *Prysock,* 453 U.S. at 361).

Moreover, a defendant's waiver of his *Miranda* rights must be voluntary, knowing,

and intelligent.  *Miranda,* 384 U.S. at 444; *United States v. Curtis,* 344 F.3d 1057, 1066

(10th Cir. 2003).  To be voluntary, the waiver must be the product of a free and

deliberate choice and not intimidation, coercion, or deception.  *Colorado v. Spring,* 479

U.S. 564, 573 (1987); *Curtis,* 344 F.3d at 1066.  In addition, the waiver must have been

made with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. *Spring,* 479 U.S. at 573; *Curtis,* 344 F.3d at 1066.

To determine whether a waiver was valid, a court must consider the totality of the circumstances. *Spring,* 479 U.S. at 573; *Curtis,* 344 F.3d at 1066. A statement is involuntary if coercive police activity played a significant role in inducing the statement. *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). The question of whether a confession was voluntary is a mixed question of law and fact subject to review under § 2254(d)(1). *Trice v. Ward,* 196 F.3d 1151, 1169 (10th Cir. 1999) (citing *Miller v. Fenton,* 474 U.S. 104, 111-12 (1985)).

The Colorado Court of Appeals rejected Applicant's *Miranda* claim on the following grounds:

> Before an individual may be subjected to custodial interrogation, he must be advised that he has the right to remain silent, anything he says may be used against him, he has the right to have a lawyer present during the interrogation, and if he cannot afford a lawyer, one will be appointed for him. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966); *accord Florida v. Powell,* 559 U.S. __, 2010 WL 605603, *7 (2010); *People v. Redgebol,* 184 P.3d 86, 93 (Colo. 2008). If a defendant waives these rights, his statements are admissible against him during the prosecution's case-in-chief. *See People v. Mangum,* 48 P.3d 568, 571 (Colo. 2002). The prosecution bears the burden of proving by a preponderance of the evidence that a defendant's waiver of these rights was knowing, intelligent, and voluntary. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986); *People v. Clayton,* 207 P.3d 831, 834-35 (Colo. 2009).
>
> To determine the validity of a defendant's *Miranda* waiver, the court considers the totality of the circumstances, using a two-step inquiry: "first, [we] determine whether the defendant was adequately warned of the privilege against self-incrimination and his right to counsel; and second, [we] determine whether the defendant knowingly, intelligently, and voluntarily waived these rights." *People v. Martin,* 222 P.3d 331, 334 (Colo. 2010)

(quoting *People v. Chase,* 719 P.2d 718, 720 (Colo. 1986)).  We review the district court's determination of the validity of a *Miranda* waiver de novo.  *Id.; People v. Munsey,* __ P.3d __, __, 2009 WL 1476947, *14 (Colo. App. No. 04CA1405, May 28, 2009).

A defendant's waiver is knowing and intelligent when he "has full awareness of the nature of the right being abandoned and the consequences of its abandonment." *People v. Jewell,* 175 P.3d 103, 105 (Colo. 2008); *accord Redgebol,* 184 P.3d at 93.  Having a "full awareness" means only that a defendant minimally understood his rights and the consequences of waiving them, and not that he necessarily understood the tactical advantages of asserting them. *See Colorado v. Spring,* 479 U.S. 564, 576-77 (1987); *accord People v. Al-Yousif,* 49 P.3d 1165, 1169 (Colo. 2002); *People v. King,* 151 P.3d 594, 597 (Colo. App. 2006).

To determine whether the waiver was knowing and intelligent, the court considers primarily the objective circumstances surrounding the waiver, rather than the defendant's subjective understanding.  *See Al-Yousif,* 49 P.3d at 1170.

Based on our review of the record, we conclude initially that the detective adequately advised defendant of his *Miranda* rights.  The detective read defendant his rights, and after reading each one, asked defendant if he understood.  Defendant said that he did – he even repeated some of them in his own words – and he put his initials by each one, again indicating that he understood.  *See Powell,* 559 U.S. at __, 2010 WL 605603, *9 ("Although the warnings were not the *clearest possible* formulation of *Miranda's* right-to-counsel advisement, they were sufficiently comprehensive and comprehensible when given a commonsense reading.") (emphasis in original); *Clayton,* 207 P.3d at 835 (verbal advisement was sufficient even though it "was conducted 'in a perfunctory way,'" where officer read the rights from a standard form, the defendant was also given a written form to review, and the defendant acknowledged that he understood his rights); *Al-Yousif,* 49 P.3d at 1170 (advisement was adequate even though it was read quickly).

We also conclude, based on the following evidence, that the district court's finding that defendant understood his right to counsel is supported by the record.

• Defendant testified that he has an eleventh grade education and can read and write English.  *See People v. Humphrey,* 132 P.3d 352, 358

36

(Colo. 2006) (the defendant's education is relevant); *People v. Kaiser,* 32 P.3d 480, 486-87 (Colo. 2001) (same).

- The detective asked defendant if he understood his rights after she read each one to him and then again after she had completed the entire advisement. Defendant responded affirmatively each time. She also asked defendant if he had any questions about his rights immediately after she read them to him and before he initialed that he understood them. *See Al-Yousif,* 49 P.3d at 1172 (the court may rely, at least in part, on a defendant's own statements expressing understanding); *Kaiser,* 32 P.3d at 486 (same); *People v. Grenier,* 200 P.3d 1062, 1070 (Colo. App. 2008) (same).

- Defendant repeated some of the rights to the detective, in his own words. *See Jewell,* 175P.3d at 106.

- During the interview, defendant answered questions appropriately, appeared coherent and alert, and appeared to understand the gravity of his situation. *See Clayton,* 207 P.3d at 836; *Kaiser,* 32 P.3d at 486; *Grenier,* 200 P.3d at 1070.

We are not persuaded that defendant's statements that he did not have a lawyer and that he thought getting one was "out of the question" demonstrated that he did not understand his right to counsel. Defendant made these statements immediately after he said he understood he had the right to have an attorney present during questioning. Further, after defendant said he did not have a lawyer, the detective reiterated that he had the right to speak to one. Defendant did not ask for further clarification. Read in context, his statement, "So I guess that's out of the question," is so vague that we cannot conclude that it clearly refutes the district court's factual finding that defendant understood his rights.

(ECF No. 9-15 at 9-14).

The Court has reviewed carefully the state court record. At the suppression hearing, Detective Wagner testified that she verbally advised Applicant of his *Miranda* rights, and that Applicant stated he understood his rights and even repeated some of them in his own words. (*See* State Court R., 10/11/06 Hrg. Tr. at 104-116; *see also* Tr. of 2/2/06 Taped Interview with Det. Wagner and Ira Miner). She also testified that she provided Applicant with a written form to advise him of his *Miranda* rights and that

Applicant wrote his initials next to each one.  (*Id.*).   Finally, Detective Wagner testified that Applicant spoke and understood English, did not appear intoxicated, and answered questions appropriately, appeared coherent and alert, and appeared to understand the gravity of the situation.  (10/11/06 Hrg. Tr. at 100-114, 116).

In denying the motion to suppress, the trial court considered the totality of the circumstances and found that the *Miranda* warnings were adequate and sufficient; Applicant's waiver of his *Miranda* rights was knowing, intelligent, and voluntary; and found that Applicant's statements that he did not have a lawyer and that he "guessed that's out of the question" did not render his waiver unknowing.  (*See* State Court R., 10/11/06 Hrg. Tr. at 131-133, 176-79; 10/25/06 Hrg. Tr. at 86-91).  The state court's factual findings are entitled to a presumption of correctness under § 2254(e)(1).

Applicant fails to rebut the presumption by clear and convincing evidence.  The Court cannot find, after considering the totality of the circumstances, that the state courts' ruling that Applicant's *Miranda* waiver was knowing, intelligent, and voluntary despite his alleged confusion, to be contrary to or an unreasonable application of Supreme Court precedent.  Thus, subclaim 2(d)(ii) will be dismissed.

## IV.  ORDERS

For the reasons discussed above, it is

ORDERED that the amended Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 13), filed by Ira Miner, on January 24, 2014, is DENIED and this action is DISMISSED WITH PREJUDICE.  It is

FURTHER ORDERED that there is no basis on which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c) because Applicant has not made a substantial showing that jurists of reason would find it debatable whether the jurisdictional and procedural rulings are correct and whether the Application states a valid claim of the denial of a constitutional right.  It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is denied.  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith  *See Coppedge v. United States*, 369 U.S. 438 (1962).  If Applicant files a notice of appeal he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

Dated this 8th day of April, 2015.

BY THE COURT:

William J. Martinez
United States District Judge